**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**LAKENDRA SCAIFE** **PLAINTIFF**

**v.** **Case No. 4:24-cv-000011-JM**

**COMMUNITY HEALTH SYSTEMS PROFESSIONAL SERVICES CORPORATION, and UTILIZATION REVIEW SERVICES, LLC** **DEFENDANT**

# ORDER

Plaintiff brings this racial discrimination and retaliation case pursuant to 42 U.S.C § 1981. Defendants Community Health Systems Professional Services Corporation (Community Health) and Utilization Review Services, LLC (URS) have moved for summary judgment (Doc. No. 32). Plaintiff filed a response to which Defendants replied. For the reasons stated below, the Court grants Defendants' motion for summary judgment.

Before getting into the facts particular to Plaintiff, the Court will address the confusing relationship between Community Health and URS since employees of both entities are players in this case. Defendants have established that URS was Plaintiff's employer, while Plaintiff testified that she was hired by and worked for a third entity, Community Health System, Inc. (CHS). CHS, who was initially named as a defendant but was dismissed with Plaintiff's consent (Doc. 13), is a holding company that had an indirect ownership interest in both Defendants. Community Health provides administrative support services, including human resources and IT, to CHS-affiliated entities like URS. While URS makes its own separate employment decisions, "Community Health may communicate those [URS] decisions." (Doc. No. 32-2, ¶ 6). Plaintiff named both URS and CHSPSC in her amended complaint, intending to dismiss one or the other after discovery but that has not happened. (Doc.4, p. 2, fn 2). In their motion for summary

judgment, Defendants submitted evidence that the two named defendants are separate entities and that Plaintiff was employed by URS. Plaintiff did not respond to this argument, and the Court finds that Community Health is entitled to summary judgment on the claims against it. In this order, the Court will refer to both Community Health and URS as "Defendants" in order to relay the facts as understood by Plaintiff, making the distinction when necessary.

Factual Background

Plaintiff Lakendra Scaife was working as a utilization review nurse for St. Vincent's Infirmary in Hot Springs when a former coworker, Whitney Jeffery, told her about a job with Defendants and encouraged her to apply. Following her application and interview with Belinda Harper,[1] Plaintiff was hired as a nurse Utilization Review Clinical Specialist (URCS) in October of 2021 making $30.76 per hour. At her interview Plaintiff had asked Harper if she could get a higher starting pay—she earned $34.50 per hour at St. Vincent's—but Harper told Plaintiff she could not negotiate.

Plaintiff was part of the Northwest Team that did utilization reviews and insurance denials for four hospitals located in Springdale, Bentonville, Siloam Springs, and Willow Creek. The nurses on the team worked from home. Harper, who is white, was the supervisor of the team of about twenty nurses. Plaintiff was the only black nurse on the team. Harper made hospital assignments to the team each morning depending on the number of reviews and insurance denials that were needed per hospital. The nurses would split the work among themselves. Plaintiff testified that two nurses were assigned to the Springdale hospital because of its size while only one nurse would be assigned to each of the other three hospitals. One of the nurses, Karen Dismang, was a floating URCS; she was not assigned to a specific facility like the other

[1] Harper was URS employee.

nurses but rather was assigned to help where needed.

In a memo dated June 15, 2023, Defendants' CEO[2] sent an email announcing a reduction in force (RIF) due to the "reallocation of certain utilization review responsibilities back to facilities." (Doc. No. 37, ¶ 38). The email stated that "affected employees were notified in meetings with their managers today." *Id.* URS leadership used a skills inventory evaluation that scored employees on experience and training, performance, problem-solving, interpersonal skills, customer service, reliability, and seniority. (Doc. Nos. 32-2, ¶8; 32-23[3]). Twenty employees were selected to be let go by June 30 based on the results of the evaluation, including Plaintiff.

That same day, the manager of human resources, Ashley Steele[4], called Plaintiff and told her that she would no longer have a job as of June 30, 2023 due to the restructuring. Steele told her that the observation team was being dissolved because hospitals were moving observation reviews away from Defendants and back to the hospitals. Plaintiff was offered a severance package at that time, which she did not accept. Plaintiff did not understand why the loss of the observation reviews would cause her to lose her job since she was not on the team responsible for observation reviews. However, she started looking for another job. When Harper was informed by HR that Plaintiff was being let go as part of the RIF, she began restructuring her team and adjusting the schedule. Harper was out of the office the last week of June. (Doc. Nos. 32-2, ¶ 22 and 32-14),

After the RIF announcement and before June 30, several employees took jobs directly with the hospitals and others resigned voluntarily. This reduced the number of employees

[2] To add to the confusion over Defendants' entities, the email was on CHS letterhead.
[3] The hospital name listed on the skills inventory for workforce reduction was "CHS UR Staff".
[4] A Community Health employee.

initially selected for termination from twenty to four. (Document 32-2, ¶ 11).

On Wednesday, June 28, Plaintiff was taken off her Microsoft Teams chat, which interfered with her ability to get work assignments directly. When Plaintiff emailed Harper about it, Harper directed Plaintiff to another employee to get her work assignments for the rest of the week. Friday was Plaintiff's last scheduled day. The same day Harper gave three white nurses who had been added to her team access to the Teams chat.

On or about Friday, June 30, Plaintiff received a call from Lisa Green, the director of HR.[5] Green told Plaintiff that she had the opportunity to continue her employment, and that nothing would change. After taking some time to think about it, Plaintiff called Green back and accepted continued employment on the condition that Green could ensure that she would no longer be treated differently or unfairly as she had been when she was denied access to Teams. Green told her that the problems with her Teams access should not have happened—she should have had access through the 30th—and would be resolved.

Harper was advised on July 2nd that Plaintiff would continue her employment. (Doc. No. 32-2, ¶ 17.) When Harper returned from vacation on Monday, July 3rd, "URS leadership had already reassigned [Plaintiff] to a different team." (Id. at ¶ 22).

On Monday, July 3, 2023, Plaintiff's Teams access was restored but she was not on the schedule to work. Instead, Harper emailed Plaintiff and gave her an assignment for that day at one of the Northwest hospitals. A white woman, Leah Hawkins, was on the Teams schedule in Plaintiff's place. Hawkins had been on the observation team that was eliminated. Plaintiff was also not on the schedule for the holiday of July 4th, though she had not been told and had been unable to confirm her schedule.

[5] Another Community Health employee.

On July 5th, Harper emailed Plaintiff and notified her that "due to resignations and downsizing," Plaintiff would be moved to "Patricia's team" and cover a new hospital starting Monday, July 10th. (Doc. No. 32-8). She would continue to work remotely. Harper gave Plaintiff her assignments on the Northwest team for the rest of that week. Later that same day Plaintiff had a Google meeting with Lenora Gray,[6] a director of the utilization review department, about Harper's email. Plaintiff expressed her frustration with the lack of communication from Harper and Green and asked Gray why she was being moved to another team instead of Hawkins who had just started on the Northwest team. Gray asked her if she did not want to move to the new team and told her that the work was the same. Plaintiff said Green had told her that "nothing would change" if she continued her employment, but having to move to a new team and new hospital would be like learning a new job. Gray said she would check with Green and get back with Plaintiff, but she did not.

On or about July 6th, Plaintiff received a call from her new manager who told her she would need to go through an orientation and some training for her new assignment. Plaintiff tried unsuccessfully to contact Green that day and the next.

On July 10, 2023, Plaintiff called Green and told her she was choosing not to continue her employment and asked if the severance package previously offered was still available. She wrote an email the same day citing the "continued harsh and inequitable treatment from [Harper]" as the reason. In her deposition, she explained that this treatment consisted of lack of communication by Harper in spite of multiple calls and emails; being removed from the Northwest team where she had been for two years; having to start orientation at a new hospital; and having to reach out to a coworker for her assignments during the time she did not have

[6] Gray, who is black, was an employee of URS.

access to Teams. Plaintiff was sent a severance package offer which she ultimately did not accept since it would have required her to waive her right to file an employment action.

Plaintiff brings § 1981 claims for racial discrimination and retaliation based on these facts. She also argues that she was constructively discharged.

Legal Standard

Summary judgment is appropriate only when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). While a nonmoving party is entitled to any favorable inferences from the facts, it "may not, however, rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial. *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

Race Discrimination

Race discrimination by an employer is proscribed by 42 U.S.C. § 1981. Plaintiff's § 1981 discrimination and retaliation claims are analyzed under the same framework as Title VII claims. *Collins v. Union Pac. R.R. Co.*, 108 F.4th 1049, 1052 (8th Cir. 2024). "To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

Plaintiff does not argue that she has direct evidence of discrimination, so she must create "an inference of unlawful discrimination" under the familiar burden-shifting framework.[7] This requires her to first establish a prima facie case by showing that (1) she is a member of a

[7] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *Macklin v. FMC Transp., Inc.*, 815 F.3d 425, 427 (8th Cir. 2016). Plaintiff's burden at this stage is "not onerous." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 852 (8th Cir. 2005).

As to the third element, the Eighth Circuit has recognized that "'[t]he Supreme Court recently obviated the requirement—replete in our case law—that the [adverse employment action] be 'significant,' 'material,' or 'serious.'" *Cole v. Grp. Health Plan, Inc.,* 105 F.4th 1110, 1114 (8th Cir. 2024) (quoting *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 354-55 (2024)). "An adverse employment action is one that results in 'some harm' to 'an identifiable term or condition of employment.'" *Martinez-Medina v. Rollins*, 144 F.4th 1091, 1096 (8th Cir. 2025) (quoting *Muldrow*, 354-55). A plaintiff can satisfy the fourth element and establish an inference of discrimination, "in multiple ways, such as by showing more favorable treatment of similarly situated employees who are not in the protected class, biased comments by a decisionmaker, or that the employer failed to follow its own policies or shifted its explanation of the employment decision." *Mayorga v. Marsden Bldg. Maint. LLC*, 55 F.4th 1155, 1162 (8th Cir. 2022) (citation omitted).

If a plaintiff establishes a prima facie case, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for her termination. "The defendant need not persuade the court, it must simply provide evidence sufficient to sustain a judgment in its favor." *Krenik* at 958. If the defendant meets its burden of production, the burden shifts back to the plaintiff to establish that the defendant's proffered explanation is pretextual. *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 520 (8th Cir. 2010). At this stage, a plaintiff "must do more than simply create a factual dispute as to the issue of pretext; [a plaintiff] must offer sufficient evidence for a

reasonable trier of fact to infer discrimination." *Mathews v. Trilogy Commc'ns, Inc.*, 143 F.3d 1160, 1165 (8th Cir. 1998) (citing *Rothmeier v. Inv. Advisers,* 85 F.3d 1328, 1335 (8th Cir.1996)).

Plaintiff challenges the following actions as discriminatory: (1) two white coworkers (Jeffery and Coral Johnston) started at a higher starting pay than she did; (2) she was given a heavier workload than her white coworkers and denied the opportunity to work overtime; (3) she was selected to be let go in the RIF; (4) she was transferred to another team; and (5) a coworker displayed an offensive image of a black woman on a Teams chat.[8]

1. Disparate pay. Plaintiff has established a prima facie case of discrimination on her claim of disparate pay. Whitney Jeffery and Coral Johnston, both white, were URCS nurses on the Northwest team also supervised by Harper. Both had also previously worked at St. Vincent's like Plaintiff. Both started working for Defendants about the same time, and both started at a higher hourly rate than Plaintiff.

Defendants have submitted sworn statements from Harper, Green, and Steele as well as job history records for Jeffery and Johnston. (Doc. Nos. 32-5, 32-2, 41-2, 41-1, 32-3, and 32-4). These statements and records establish a legitimate, nondiscriminatory reason for the pay discrepancy. Jeffery and Johnston did not come directly to URS like Plaintiff did. Instead, they came as lateral transfers from a different CHS-affiliated entity as part of a "go-live plan" to centralize utilization review operations to URS. The centralization plan began with employees who were hired in a pilot group at various CHS-affiliated entities. Both Jeffrey and Johnston were in the pilot group. Both had been hired by Northwest Medical Centers to work on-site at

[8] Plaintiff initially alleged that the holiday work schedule was evidence of racial discrimination, but she did not respond to Defendants' argument on this issue and has thus waived it. *Pratt v. Helms*, 73 F.4th 592, 595 (8th Cir. 2023).

Springdale and negotiated their salaries with that facility. Jeffery was hired on June 1, 2021 and Johnston on July 26, 2021. Each was hired by a different supervisor and had different starting pay. Plaintiff was hired by URS in October of 2021 in the second of four hiring waves in the centralization plan. Jeffrey and Johnston were part of the pilot-employees transfer that occurred on December 5, 2021. At the time of their transfers to Harper's team, Jeffrey was making $35.78 per hour and Johnston was making $34.01 per hour. Harper stated that lateral transferees retained the rate of pay they had received at their previous positions. When she interviewed Plaintiff, she had no authority to determine the starting pay for employees. With this evidence, the burden shifts back to Plaintiff to establish that these reasons were pretext.

In response to these sworn declarations of facts, Plaintiff relies on her deposition testimony recounting a conversation she had with Jeffery about a year after she began working for URS. (Doc. No. 32-1, pp. 35-36). According to Plaintiff, Jeffery said that both she Johnston had been interviewed by Harper and allowed to negotiate for a higher starting pay rate. Plaintiff does not offer the testimony of Jeffery or Johnston, however, and cannot rely on her inadmissible hearsay statements to rebut the sworn statements of Harper, Green, and Steele. *Sherman v. Collins*, 158 F.4th 904, 908 (8th Cir. 2025). Plaintiff also asserts that Jeffery and Johnston left St. Vincent and went directly to URS, that they did not work somewhere in between. (Id. at 36). This testimony is insufficient to create a question of fact in light of the job history records submitted by Defendants.

Defendants presented evidence of a legitimate, nondiscriminatory reason for the pay disparity. This same evidence eliminates Jeffery and Johnston as comparators, given the "rigorous requirement that the comparators be similarly situated in all relevant respects" at the pretext stage. *Boston v. TrialCard, Inc.*, 75 F.4th 861, 868 (8th Cir. 2023). Plaintiff has not come

forward with proof admissible at trial from which a jury could infer that the difference in starting pay was motivated by discriminatory intent.

2. Workload. Plaintiff argues that she was discriminated against because of her race by being given a heavier workload than her white coworkers. Plaintiff testified that Harper was supposed to split the work assignments evenly each day. She acknowledged that the assignments were made by hospital and not by the number of reviews needing to be done that day, "because it depends on how many people come into the hospital, and there's no real way for us to determine that." (Doc. No. 32-1, p. 40). The assignments were tentative and could change during the day as needed.

Plaintiff testified that she was either assigned to the Bentonville hospital alone or assigned to half of Springdale (given its larger size) and all of another, smaller hospital (Siloam Springs or Willow Creek). When she was assigned to half of Springdale, she and the other assigned URCS "would see how many reviews there were and we were supposed to split that evenly." *Id*. at 41. Plaintiff complains that there were several days that she had to work Springdale on her own when Jeffery or Johnston were not working. On those days, Dismang was supposed to step in and help her, but Plaintiff testified Harper would tell Dismang "that she did not have to help me" and to go help a different URCS instead. *Id*. at 44. Plaintiff also stated that there were days that she had to complete Dismang's insurance denials as well as her own. [9]

Plaintiff submitted records from four days in February and March of 2023 where she completed more reviews than other URCSs. (Doc. No. 38-1). She includes nurses from other teams with different supervisors in her assessment. These other URCSs (Connecia McCoy,

---

[9] Dismang's job duties as a floater were different from Plaintiff's and she is not similarly situated.

Denise Puffett, Rhonda Wilbourn) are not valid comparators. Nor is Dismang a valid comparator, as she was a floater with different responsibilities. At most, the records she relies on establish that she did more Springdale reviews on March 8, 2023 than Jeffery did.

Plaintiff also argues that she was denied the opportunity to work overtime to complete her heavier workload. Plaintiff acknowledges that Harper was conveying the company message that overtime was discouraged. (Doc. No. 37-2). Plaintiff never asked for overtime that she was denied. (Doc. No. 32-5, ¶ 18). Nor has she established that a white coworker was allowed to work overtime under circumstances that she was not.

Assuming without deciding that being assigned a heavier workload on certain days constitutes "some harm," she has not shown how this circumstance allows an inference of discrimination. "On its face, this kind of treatment is race-neutral." *Sherman v. Collins*, 158 F.4th 904, 908 (8th Cir. 2025). The record does not establish that Plaintiff was the only nurse who ever had to cover Springdale on her own or pick up work from Dismang. There is evidence to suggest that other nurses also had issues with the amount of work Dismang did. In a February 21, 2023 email exchange between Plaintiff and Jeffery, Plaintiff complains that Dismang "didn't even do 1 Springdale review." (Doc. No. 32-16). Jeffery responded, "ugh. I swear. I don't know why Belinda is so taken with her. She is so sweet but she is super slow which isn't much help when we are short." *Id.*

To defeat a motion for summary judgment, an inference must be reasonable, one "that can be drawn from the evidence without resort to speculation.'" *P.H. v. Sch. Dist. of Kansas City,* 265 F.3d 653, 658 (8th Cir.2001) (quoting *Elam v. Regions Fin. Corp.*, 601 F.3d 873, 877 (8th Cir. 2010)). On the evidence presented, it is not reasonable to infer that Plaintiff was given a heavier workload because she is black and her coworkers were white, as Plaintiff suggests. (Doc.

No. 38, p. 29) ("Again, [Plaintiff] was the only African American nurse who was part of the Northwest Arkansas Team."). The fact that she is black and her coworkers are white establishes only one element of a prima facie case. It is insufficient to allow an inference of discrimination, much less carry her burden of persuasion. The Court finds that Plaintiff has not established a prima facie case of discrimination based on her workload or overtime restrictions.

3. <u>RIF decision</u>. Plaintiff argues that the reason given for her announced termination was false and that she was selected for termination because of her race. The Court will address this claim of discrimination starting at the second and third stages of the McDonnel-Douglas framework.

On June 15, 2023, Ashley Steele from HR called and told Plaintiff she was being let go due to restructuring, specifically that the observation review team was being dissolved due to the hospitals taking on those responsibilities in house. Defendants submitted evidence that the twenty individuals chosen to be let go were scored by URS leadership using skills inventory evaluation. (Doc. No. 32-2 and -12). Jeffery, who no longer worked for Defendants at the time the inventory was conducted, was not ranked. Johnston scored 65 on relevant job experience and training, 65 on latest job performance evaluation, 65 on versatility for other duties as needed, 65 on problem solving ability, 65 on interactive skills with others, 65 on customer service, 65 on attendance and reliability, and scored a 0 on seniority, for a total score of 455. Plaintiff scored the same as Johnston in job experience, attendance and seniority. She scored lower than Johnston in the remaining categories: latest job performance evaluation (35), versatility (35), problem-solving ability (50), interactive skills (35), and customer service (35), for a total score of 320. This evidence establishes a nondiscriminatory reason for Defendants' decision to let Plaintiff go as part of the RIF.

Plaintiff flatly denied that any type of ranking system was used. (Doc. No. 37, ¶ 43). However, this unsupported denial is insufficient to create a genuine issue of a material fact in the face of Defendant's proffered evidence. Plaintiff did not submit any proof to the contrary, and there is no reason to think she would have personal knowledge about how the RIF selections were made. Plaintiff argues that "[i]f objective criteria were being used in the scoring," she would not have scored lower than Jeffery and Johnston since she had been a nurse longer than both of them and had a higher level of education. (*Id.* ¶ 40). However, education was not a factor in the skills inventory, nor was length of time since becoming a nurse. Plaintiff does not offer any evidence to challenge the validity of her lower scores on the skills inventory. She does not argue that the use of subjective criteria was improper. She does not offer evidence to contradict that she was part of a company-wide RIF announced on June 15. There has been no evidence or argument that the RIF unfairly targeted black employees.

Plaintiff maintains the position that since she was not on the observation review team, "[the elimination of the observation team] should not have resulted in her losing her job." (Doc. 38, p. 30).[10] She also points out that Jeffery had already stopped working for Defendants on June 3, 2023 "meaning that there was a vacancy" on Harper's team. (*Id.*). As the Eighth Circuit has often stated, "we do not 'sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 955 (8th Cir. 2012) (quoting *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 781 (8th Cir.1995)). Plaintiff does not dispute that the observation review team was dissolved when the hospitals took that function

[10] In her brief Plaintiff refers the Court to her response to the statement of undisputed fact No. 36 in Doc. No. 37—but this response admits that she was offered a severance package that she denied.

on themselves. She does not dispute that as a result of restructuring, "the overall staffing needs within the URS department were reduced." (Doc. No. 32-2, ¶ 7). It does not matter that she was not on the observation review team. Defendants offered a legitimate and nondiscriminatory explanation for its decision. The evidence before the Court does not allow an inference that the decision to include Plaintiff in the RIF was racially discriminatory.

4. Transfer to another team. Plaintiff argues that Defendants' decision to transfer her to another team was discriminatory. Plaintiff was told by Steele that nothing would change if she accepted continued employment. She points out that Leah Hawkins, a white employee who had been on the observation team, took her place on the schedule for Harper's team. Though she would still be working remotely, Plaintiff has established that she would have been required to attend orientation and to learn new duties specific to the new hospital. After *Muldrow*, the Court will assume without deciding that this is sufficient to show "some harm" to "an identifiable term or condition of employment." *Martinez-Medina v. Rollins*, 144 F.4th 1091, 1096 (8th Cir. 2025) (quoting *Muldrow*, 354-55).

Defendants provided evidence that Plaintiff was one of twenty employees selected for the RIF based on race-neutral factors. After the June 15th RIF announcement, the restructuring began. Hawkins had not been selected for the RIF and she was transferred to Harper's team on or around June 28[11]. Harper was not notified until July 2, 2023 that Plaintiff was continuing her employment. However, by the time Harper returned from her vacation on Monday July 3rd, "URS leadership" had already assigned Plaintiff to a different team. (Doc. No. 32-4, ¶ 22). Harper relayed that information to Plaintiff on July 5th. This is sufficient to evidence a legitimate race-neutral reason for the transfer.

[11] This was the day she was added to the Teams chat.

Plaintiff relies on her conversation with Green on June 30th and Gray on July 5, 2023 to argue that she was given shifting reasons for her transfer to another team. Her argument on this issue is as follows:

> Initially Ms. Scaife was told that she was losing her job due to the observation team being eliminated. Again, Ms. Scaife was not on the observation team, and it should not have affected her. Belinda Harper removed Ms. Scaife, the only African American, from her team and replaced her with Leah Hawkins, who is white, and was on the observation team.
>
> Ms. Scaife then got a phone call from Lenora Gray . . . who also told Ms. Scaife that she was being moved to a different team, under a different manager, and to a different state, due to the observation team being eliminated. *However, Ms. Scaife let Ms. Gray know that she already had spoken with Lisa Green*, *who stated that the reason Ms. Scaife was being moved was not due to the observation team being eliminated*. This surprised Ms. Gray that Ms. Scaife knew this information. When Ms. Scaife pointed this out, Ms. Gray then changed her story saying that Scaife was being moved to another team because she was the only one who had MEDHOST Clin-View access. However, Ms. Scaife pointed out that all of the nurses on the Northwest Team had MEDHOST Clin-View. After Ms. Gray was informed of this information by Ms. Scaife, she stated that she would get back to Ms. Scaife, but she never did.

(Plaintiff's brief, Doc. No. 38, p. 27-28) (emphasis added).

Plaintiff has not directed the Court to any specific language attributed to Green that would support her claim that Green "stated that the reasons Ms. Scaife she was being moved was not due to the observation team being eliminated."[12] In her call with Gray about her re-assignment, Plaintiff states that Green had told her that there was room for to her to stay on her same team. Gray said she would need to talk to Green about any specific assurance she made, that due to resignations she knew there was a staffing need on the new team for someone with MEDHOST Clin-View access and she didn't know if the nurses who were newly assigned to

---

[12] While no transcript was provided, the Court listened to the recorded calls, two with Green and one with Gray. Plaintiff recorded the calls and her voice is easy to hear, but Green and Gray's voices are much more difficult to hear.

Harper's team had that access. Plaintiff told her at least one of the nurses did, so that was not the reason. Gray did not say that she was being moved to another team "because she was the only one who had MEDHOST access." While Plaintiff the evidence must be viewed most favorably to Plaintiff, she has not established that the reasons for her assignment to another team have shifted.

Assuming the conversations with Green and Gray can be interpreted as Plaintiff argues, this would only supply the fourth element of her prima facie case. Defendants have presented a race-neutral reason for her reassignment—that Plaintiff was selected to be let go as part of the RIF, that Hawkins was not and was reassigned to Harper's team, that when Plaintiff elected to continue her employment, URC leadership assigned her to a different team. Plaintiff has not carried her burden of persuasion that the real reason she was being assigned to a different team was because of her race.

5. Image of a black woman. Plaintiff has not made a claim for hostile work environment, but she offers evidence of an isolated instance in which a coworker posted an image of a black woman on a Teams chat (Doc. No. 38-3, p. 10). Plaintiff characterizes the image as "an ugly and disrespectful caricature of a black woman." (Doc. No. 38, p. 29). At least one coworker posted a laughing emoji in response. Plaintiff is unsure if the image was posted in February of 2022 or 2023. Plaintiff offers this as evidence of "discriminatory treatment" she experienced. While Harper did not post the image, Plaintiff criticizes her for not demanding that the image be taken down. Harper's mere failure to respond to the single posting on Teams of an inappropriate image that occurred either four months or sixteen months prior to the decision to let Plaintiff go is not evidence of discrimination. *See Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012).

IV. Retaliation

"To establish a *prima facie* case of retaliation, an employee must prove that (1)[s]he engaged in protected conduct, (2) [s]he suffered a materially adverse employment action, [13] and (3) the adverse action was causally linked to the protected conduct." *Warren v. Nucor Corp.*, 150 F.4th 990, 997 (8th Cir. 2025), *cert. denied,* 146 S. Ct. 2642, 224 L. Ed. 2d 832 (2026) (internal quotation omitted). The Court finds that Plaintiff has not established the elements of a prima facie case.

"An employee engages in a protected activity under § 1981 when the employee has opposed any practice made unlawful by Title VII involving race-based discrimination." *Warren v. Kemp*, 79 F.4th 967, 973 (8th Cir. 2023). Plaintiff argues that she engaged in protected activity when she spoke to Green on June 30, 2023 and let her know that Harper had revoked her Teams access on June 28. Green had called Plaintiff for the purpose of letting her know that she had the opportunity to continue her employment. During the call, Plaintiff complained that her Teams access had been revoked and without it, she could not access her schedule. Plaintiff told Green that at the same time she was taken off Teams, three other nurses were added. Those three other nurses were white, but Plaintiff did not mention their race to Green and the record does not establish whether Green knew they were white. Plaintiff told Green that when she reached out to Harper to find out why her Teams access was revoked, Harper directed her to a coworker to get the information she needed for the next two days. This was frustrating to Plaintiff who felt like she had "to go on a wild goose chase to just find out where to work, what days to work." (Doc.

---

[13] *Muldrow* acknowledged that there is a higher bar to establish an adverse employment action in a retaliation claim, citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms.)

No. 21-1, p. 77). She told Green she would agree to continue her employment if Green could ensure that she would not continue to be treated unfairly or differently, that she had not done anything to be treated inequitably. She did not mention any concerns about her workload, her pay, or the offensive image. She did not mention race. Plaintiff's complaint to Green that her Teams access had been revoked by Harper does not constitute protected activity.

Secondly, Plaintiff's transfer to another team—where she would keep the same title and the same pay and still be allowed to work remotely—was not a materially adverse employment action. In the context of a retaliation claim, "[e]mployment actions which do not result in changes in pay, benefits, seniority, or responsibility are insufficient to sustain a retaliation claim." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 715 (8th Cir. 2000).

Finally, Plaintiff has not established that but for her complaint to Green she would not have been moved to another team. "A plaintiff must show the employer had actual or constructive knowledge of the protected activity in order to establish a prima facie case of retaliation." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 715 (8th Cir. 2000). Plaintiff did not mention race in her call with Green. Green has stated that Plaintiff's "concern regarding unfair treatment was specifically related to not having access to Microsoft Teams to view her schedule." (Doc. No. 32-2, ¶ 15). Without evidence that Green had knowledge that Plaintiff's complaint was race-based, Plaintiff cannot establish a causal link to the subsequent employment action. *See Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 722–23 (8th Cir. 2008) (Employer had no actual or constructive knowledge of protected activity when "[employee] gave [employer] no indication that the 'respectful workplace issues' to which she referred concerned anything more than what she perceived to be rude or angry comments that were inconsistent with the respectful

workplace policy.")

Constructive Discharge

Plaintiff resigned from her employment on July 10, 2023. She does not allege constructive discharge in her complaint.[14] However, to the extent the issue was argued in the briefs, the court finds that Plaintiff has failed to establish facts to support a claim for constructive discharge. "To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in [her] situation would find the working conditions intolerable, and (2) the employer intended to force [her] to quit." *Parker v. United States Dep't of Agric.*, 129 F.4th 1104, 1114 (8th Cir. 2025) quoting *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007)). "The bar to show constructive discharge is high." *Bell v. Baptist Health*, 60 F.4th 1198, 1203 (8th Cir. 2023) (citation omitted).

Plaintiff has not presented evidence that she "faced objectively intolerable working conditions." *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 497 (8th Cir. 1996). She was understandably frustrated at the lack of communication by Harper and HR after she gave notice of her intention to continue her employment. The lack of communication was no doubt exacerbated by Harper's absence from the office in what was supposed to be Plaintiff's last week of work followed by the Fourth of July holiday. However, Plaintiff did not suffer any objectively adverse consequences from this lack of communication, no missed pay or reprimands. And she was given the opportunity to continue employment at the same pay and with the same title and working conditions. This does not demonstrate an intent to force Plaintiff to quit. Plaintiff did not think it fair that she was moved to a different team which would require some additional

[14] In her complaint she alleges that she was terminated by Green in a July 10, 2023 phone call though the record does not support that allegation. (Doc. No. 4, ¶85).

training. It may not have been. Regardless, this does meet the high bar of establishing a constructive discharge.

Conclusion

For the reasons stated above, Defendant's motion for summary judgment (Doc. No. 32) is GRANTED. A separate judgment will be entered.

IT IS SO ORDERED this 30th day of September, 2026.

UNITED STATES DISTRICT JUDGE